IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LILLIE M. COOK,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )        Civil Action No. 3:22-cv-129–HEH
                                   )
PRINCE GEORGE COUNTY               )
SCHOOL BOARD,                      )
                                   )
            Defendant.             )

## MEMORANDUM OPINION
**(Granting Defendant's Motion for Summary Judgment)**

This matter is before the Court on Defendant Prince George County School

Board's (the "School Board") Motion for Summary Judgment (the "Motion," ECF

No. 17), filed on December 17, 2022.  Plaintiff Lillie M. Cook ("Plaintiff") drove a

school bus for the School Board from 2013 until June 12, 2020, when the School Board

decided not to renew her contract for the 2020/2021 school year.  Plaintiff, an African

American, alleges that the School Board did not renew her contract because of her race or

because she filed a report accusing the School Board of discrimination and workplace

harassment.  (Compl. ¶¶ 51–72, ECF No. 1.)  The School Board disagrees and seeks

summary judgment because Plaintiff was not subject to racial discrimination or

retaliation and was not meeting the School Board's legitimate expectations.  (Def.'s Br.

in Supp. at 1, ECF No. 18.)

The parties have submitted memoranda supporting their respective positions, and

oral argument was heard on February 13, 2023.  For the reasons stated below, the Court

will grant Defendant's Motion as to all counts and dismiss the case with prejudice.

## I. STANDARD OF REVIEW

Pursuant to Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248.

The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a

2

summary judgment motion. *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir.

2020). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must

be material to an issue necessary for the proper resolution of the case, and the quality and

quantity of the evidence offered to create a question of fact must be adequate."

*Thompson Everett, Inc. v. Nat'l Cable Advert.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing

*Anderson*, 477 U.S. at 252). "[T]here must be 'sufficient evidence' favoring the

nonmoving party for a jury to return a verdict for that party. If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Holland*

*v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (citing *Anderson*, 477 U.S. at

249–50). When applying the summary judgment standard, courts must construe the facts

in the light most favorable to the nonmoving party and may not make credibility

determinations or weigh the evidence. *Holland*, 487 F.3d at 213.

## II. BACKGROUND

As required, the Court resolves all genuine disputes of material fact in favor of the

nonmoving party and disregards immaterial factual assertions. *Anderson*, 477 U.S. at

248, 255. Applying this standard, the Court concludes that the following narrative

represents the facts.[1]

Plaintiff began working as a school bus driver with the School Board from 2013

---

[1] The Court cites to the Statement of Undisputed Material Facts ("SUMF") contained in the School Board's Brief in Support wherever appropriate. (Def.'s Br. in Supp. at 2–8.) Otherwise, the Court cites directly to the exhibits submitted by the parties.

until June 12, 2020. (SUMF ¶ 1.)  For the 2019/2020 school year, Plaintiff had both a bus driver contract and a contract for the Shuttle Run, which transfers students from the high school to the middle schools.  (*Id.*)

Superintendent Lisa Pennycuff, Ed.D. ("Dr. Pennycuff") has been the Superintendent of Prince George County Public Schools since July 1, 2019, following her role as an Assistant Superintendent since 2015.  (*Id.* ¶ 2.)  Laura Estes, Ed.D. ("Dr. Estes") has been the Chief Human Resource Officer for Prince George County Public Schools since January 6, 2020.  (*Id.* ¶ 3.)  Ronald Rhodes served as Director of Transportation for the School Board from July 2004 to July 2014, after which he assumed the position of Director of Operations and Maintenance.  (*Id.* ¶ 4.)

From July 2014 to January 2019, there was not a Director of Transportation.  (*Id.* ¶ 5.)  Instead, the department was supervised by a Coordinator of Transportation.  (*Id.*)  Clarence Thweatt ("C. Thweatt") was appointed Interim Coordinator of Transportation on February 1, 2017.[2]  (*Id.*)

In January 2019, Jeff Darby ("Darby") was employed as the Director of Transportation and served in that role until September 2019.  (*Id.* ¶ 6.)  After Darby's employment ended, Harold Grimes ("Grimes") assumed that role as a contract consultant until Dustin Nase ("Nase") was hired to be Director of Transportation effective

---

[2] During his tenure as Interim Coordinator of Transportation, C. Thweatt was Plaintiff's direct supervisor.  (SUMF ¶¶ 4–6.)

October 15, 2019.[3] (*Id.*) Prior to Nase's tenure, Grimes completed an "Areas of Concern Report" that indicated, among other issues, that the "Coordinator [of Transportation] is not evenly enforcing Transportation policy, regulations, and procedures." (*Id.* ¶ 8.) C. Thweatt continued to work as Coordinator of Transportation until July 1, 2020, when his position was reclassified as Transportation Specialist. (*Id.* ¶ 7.) C. Thweatt's employment with the School Board ended in August 2020. (*Id.*)

At one of several bus driver meetings held by Nase in November 2019, Plaintiff states Nase specifically singled her out by stating to the gathering that "[Plaintiff] was a good, skilled driver, and did her job well," or words to that effect. (Pl.'s Mem. in Opp'n at 9, ECF No. 22.) Several of the Transportation Department employees witnessed this statement. (*Id.*)

On December 18, 2019, the Transportation Department hosted a non-mandatory holiday party at the bus garage. (SUMF ¶ 9.) At this party, Transportation Department jackets that were specifically ordered for each driver were handed out to those present. (*Id.*) Plaintiff did not attend the holiday party and did not receive her Transportation Department jacket. (*Id.*) Plaintiff never asked anyone for her jacket because the jacket was specifically ordered for her based on her size, and, in previous years, someone in the Transportation Department just handed her the jacket after they arrived. (Pl.'s Mem. in Opp'n at 3.)

---

[3] During his tenure as Director of Transportation, Nase was Plaintiff's direct supervisor. (Def.'s Br. in Supp. at 3.)

5

Plaintiff did not attend the holiday party because, in mid-November, Plaintiff and several other bus drivers organized a group breakfast at Golden Corral for December 18, 2019. (*Id.*) Plaintiff asserts that she did not know of the holiday party at that time and only learned of the scheduling conflict weeks later. (*Id.*)

On December 19, 2019, Nase and C. Thweatt met with Plaintiff regarding a parent complaint that Plaintiff was rushing a child to get on the bus.[4] (*Id.* at 10.) Nase also allegedly made a request for a seating chart during this meeting. (Def.'s Reply at 12.)

On January 10, 2020, Ashley Rhodes ("Rhodes"), a Caucasian bus driver, informed Nase that Plaintiff and other drivers were allegedly standing outside of a bus talking negatively about Nase and the Transportation Department while waiting outside Clements Junior High School. (SUMF ¶ 12.) Rhodes suggested that Nase should "pull the bus tape" to hear what was being discussed. (*Id.*) Nase reviewed the bus film and eventually took it to Dr. Pennycuff and Dr. Estes. (*Id.* ¶ 13.)

Although not all parts of the video's audio are intelligible, Plaintiff can be heard saying amongst the other drivers, "We're trying to hide. Nase is at the garage and they're all up on his shit. All the drivers . . . Don't come with the bullshit . . . He ain't all that. Nase ain't all that . . . I'm brown-nosing, my nose is brown."[5] (Bus Video, ECF No. 18-

---

[4] In addition to meeting with Plaintiff regarding the parental complaint, Nase also counseled Plaintiff about her speed. (Pl.'s Mem. in Opp'n at 10.)

[5] Although Plaintiff disputes the extent to which the audio can be heard, the Court has reviewed the audio and at least the portions quoted herein are clearly attributable to Plaintiff. Further, Plaintiff admits to stating, "[d]on't come with the bullshit" with regards to the distributing of the jackets and to rubbing her nose and saying, "I'm brown-nosing, my nose is brown," regarding

11.)

Dr. Pennycuff and Dr. Estes reviewed the film and met with the drivers involved, which included Plaintiff, Addie Thweatt ("A. Thweatt"), and Elizabeth Dunlow ("Dunlow"). (SUMF ¶ 15.) Dr. Pennycuff found the behavior of "cursing" and "berating" their supervisor "unacceptable and unprofessional." (*Id.*) Each of the drivers involved in the January 10, 2020 incident were provided a Letter of Reprimand regarding their conduct.[6] (*Id.* ¶ 16.)

On February 3, 2020, Plaintiff filed a Report of Discrimination and Harassment ("Report") with the School Board. (*Id.* ¶ 17.) In the report, Plaintiff references the Letter of Reprimand, of being accused of "boycotting" the Holiday Party, that she was not provided a jacket, and that Nase targeted and harassed her "in deliberate attempts to 'pad' [her] previously empty employee files with unsubstantiated claims and unfounded complaints." (Pl.'s Report at 2, ECF No. 18-16.) The matter was assigned to Compliance Officers Stephanie Bishop (a Caucasian female), Robin Germanos (a Caucasian female), and Willie Elliott (an African American male) (collectively, the "Compliance Officers"). (SUMF ¶ 17.) The Compliance Officers investigated the report, which included interviewing Dr. Pennycuff, Dr. Estes, Nase, Plaintiff, Wayne Moore, and C. Thweatt. (*Id.* ¶ 18.)

---

other drivers "like Ida Butler, Pam Nase, and Ms. Rhodes" allegedly lying to Mr. Nase and others about Plaintiff. (Pl.'s Mem. in Opp'n at 4.)

[6] Of the drivers involved, two were African American and one was Caucasian. (SUMF ¶ 16.)

7

The Compliance Officers prepared a seven-page report, concluding that the "information revealed in the investigation did not rise to the level of harassment or discrimination," "did not contribute to a hostile work environment," and "did not support that it substantially or unreasonably interfered" with Plaintiff's work.[7]  (Pl.'s Report at 9.) Additionally, William Barnes, Assistant Superintendent of Instruction and Accountability, reviewed the Compliance Officers' Report and informed Plaintiff that there was "no prohibited harassment."  (SUMF ¶ 20.)

In February 2020, after the January 10, 2020 incident, the Letter of Reprimand, and the filing of Plaintiff's Report, the School Board alleges that concerns regarding Plaintiff's job performance and insubordination continued to appear.  (SUMF ¶¶ 21–26.)

First, the School Board alleges Plaintiff failed to timely submit her required assigned seating charts after being asked on three different occasions—November 14, 2019; December 19, 2019; and February 5, 2020.  (SUMF ¶ 22.)  All bus drivers are required to submit a seating chart for each of their bus routes.  (C. Thweatt Dep. 114:25–115:13, ECF No. 18-7; Moore Dep. 71:25–72:9, ECF No. 18-29.)  Ultimately, Plaintiff turned in one seating chart on February 5, 2020, however, she did not submit her other

---

[7] Plaintiff disputes that the recommendation made by the Compliance Officers improperly and incorrectly addressed only sexual harassment and discrimination.  (Pl.'s Mem. in Opp'n at 5.) Although the report does reference specific provisions of "Policy JFHA" that "prohibits harassment against students . . . on the basis of sex . . .," the report ultimately states "[the Compliance Officers] find that the conduct does not rise to the level of harassment, discrimination, or a hostile environment."  (Pl.'s Report at 9.)  There is no indication in either the recommendations or conclusions within the Compliance Officers' Report that explicitly show it was limited to only sexual harassment.

required chart until February 11, 2020. (*Id.*)

On February 12, 2020, C. Thweatt and Moore met with Plaintiff regarding her failure to timely submit her seating charts and issued her a written warning. (SUMF ¶ 23.) Plaintiff did not submit her seating charts as requested because she disputes that seating charts are required because that requirement does not appear in any "polices, procedures or manuals," and she was never previously required to turn in a seating chart. (Pl.'s Mem. in Opp'n at 6.) Nase initially directed C. Thweatt to issue a write-up for Plaintiff's failure to turn in one of her seating charts, but once he found out C. Thweatt asked Plaintiff to turn in her other required chart on February 5, Nase directed C. Thweatt to not issue the write-up. (*Id.* at 12.) However, when Plaintiff again failed to turn in her required seating chart, Nase and C. Thweatt issued the written warning. (Disciplinary Coaching Form, ECF No. 18-17.)

Second, on February 5, 2020, Shirron Flowers, Administrative Assistant for the Transportation Department, informed Nase that she received a call from the Prince George County Police Department reporting that a concerned citizen observed Plaintiff's bus run a red light at the intersection of Route 460 and Route 156. (SUMF ¶ 24.) Plaintiff denied running the red light and the School Board admits they could not corroborate the report from the police department, so Plaintiff was only issued a verbal coaching for the incident on February 12, 2020. (*Id.* ¶ 25.)

Lastly, on February 7, 2020, Plaintiff left a voicemail for one of the Administrative Assistants for the Transportation Department stating: "Jennifer, 105.

What's going on? I'm done now until Clements? Or What? Nobody's given us no

word. I'm still standing by? Or What? Call me. I should ride in there and ask damn

Nase. Since he's supposed to be the damn boss."[8] (SUMF ¶ 26.)

On April 2, 2020, Nase conducted Plaintiff's 2019/2020 performance evaluation.[9]

(*Id.* ¶ 28.) Nase completed the evaluation and gave Plaintiff an overall rating of

"unsatisfactory," with three "satisfactory" ratings, three "improvement needed" ratings,

and five "unsatisfactory" ratings. (*Id.* ¶ 28.) In the performance evaluation, Nase

included his concerns with Plaintiff's performance and his perception of her negative and

insubordinate behavior. (*Id.*) Additionally, the evaluation indicated that Nase would not

be recommending Plaintiff's contract be renewed at end of her current contract term.

(*Id.*) Several of the "Supportive Details and Comments" section of the performance

evaluation noted Plaintiff's lack of professionalism and insubordination toward the

Director and other team members and that Plaintiff was counseled on multiple occasions

for speeding.[10] (Pl.'s Perform. Eval. at 1–2, ECF No. 18-24.)

Dr. Pennycuff reviewed Plaintiff's performance evaluation and Nase's nonrenewal

recommendation. (SUMF ¶ 30.) On April 17, 2020, Dr. Pennycuff informed Plaintiff in

writing that she would not be recommending to the School Board that Plaintiff's contract

---

[8] The voicemail's audio clip was provided and played for the Court during oral argument.

[9] Before the 2019/2020 evaluation, Plaintiff's last performance evaluation was conducted during
the 2017/2018 school year. (SUMF ¶ 27.)

[10] Plaintiff argues that the only instance where Nase brought up Plaintiff's speed was the
December 19, 2019 meeting involving the parent complaint. (Pl.'s Mem. in Opp'n at 10.)

be renewed for the 2020/2021 school year. (*Id.*) On May 21, 2020, Dr. Estes informed

Plaintiff via email that Plaintiff was not being reappointed for the 2020/2021 school year,

and that she was free to pursue other opportunities once she completed her 2019/2020

contractual obligations. (*Id.* ¶ 32.) The School Board accepted Plaintiff's resignation as

of June 1, 2020, and Plaintiff's last day of employment was June 12, 2020. (*Id.* ¶¶ 1, 33.)

Plaintiff argues that Nase provided Dunlow, a Caucasian and full-time bus driver,

an overall "satisfactory" rating on her performance evaluation and recommended Dunlow

for renewal. (Pl.'s Mem. in Opp'n at 16.) Dunlow was issued a verbal Disciplinary

Action Form on January 8, 2020, for leaving two students at school and failing to respond

to radio communication attempts. (*Id.*) Dunlow was also issued a Letter of Reprimand

for "negative talk to other employees that undermine[s] the work of the Director of

Transportation" arising from the January 10, 2020 bus film. (*Id.*) After meeting with Dr.

Pennycuff and Dr. Estes, Dunlow met with Nase to discuss the alleged January 10, 2020

incident and ultimately wrote a letter of apology for her conduct. (*Id.*; Def.'s Reply at

14.)

On August 17, 2020, the School Board hired Machelle Bright, a Caucasian, to

replace Plaintiff. (SUMF ¶ 50.)

### III. DISCUSSION

In her Complaint, Plaintiff alleges that the School Board discriminated against her

based on her race (Count I) and retaliated against her after she engaged in protected

activity (Count II), both in violation of Title VII of the Civil Rights Act (42 U.S.C

§§ 2000e-2(a)(1) and 2000e-3(a)).  (Compl. at ¶¶ 51–72.)  The School Board moves for summary judgment on both counts.  (Mot. at 1.)  The Court will consider each in turn.

## A. Count I – Racial Discrimination

As to Count I, Title VII prohibits employers from discriminating against an employee because of their race.  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may present either direct evidence that the defendant intentionally discriminated against her or circumstantial evidence of that intent.  *Holland*, 487 F.3d at 213–14.  In this case, Plaintiff acknowledges there is no direct evidence of race discrimination.  (Pl.'s Mem. in Opp'n at 17.)  As such, when a plaintiff relies on circumstantial evidence, the Court analyzes the evidence using the *McDonnell Douglas* framework.  *Holland*, 487 F.3d at 214; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under that framework, a plaintiff must first establish her *prima facie* case by proving that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was meeting the defendant's legitimate expectations; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination.  *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 219 (4th Cir. 2016).  If the plaintiff meets those four requirements, "the burden shifts to the employer to demonstrate a legitimate non-discriminatory reason for the adverse employment action.  If the employer does so, then the plaintiff must prove that this reason was actually a pretext for discrimination."  *Brockman v. Snow*, 217 F. App'x 201, 205 (4th Cir. 2007) (citing *Hux v.*

*City of Newport News*, 451 F.3d 311, 314–15 (4th Cir. 2006)).

The School Board argues that Plaintiff cannot establish a *prima facie* case because Plaintiff cannot show she was performing at a level that met the School Board's legitimate expectations. (Def.'s Br. in Supp. at 11.)

In determining whether an employee has met their employer's legitimate expectations, the Court looks to the perception of the decision maker, not the employee's perception. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980). An employee's disagreement with an employer's criticism is irrelevant, as the real issue is whether Plaintiff's "supervisors legitimately believed that she was not meeting expectations." *Thweatt v. Prince George Cty. Sch. Bd.*, No 3:21-cv-258-HEH, 2022 WL 1696034, at *5 (E.D. Va. May 26, 2022).

Here, the School Board offers uncontradicted evidence that Nase and Dr. Pennycuff, Plaintiff's supervisors, thought she was not meeting their expectations. Plaintiff's Letter of Reprimand, her supervisor's verbal warnings or coachings, and Plaintiff's performance evaluation all provide evidence that Plaintiff was not meeting the School Board's legitimate expectations. Plaintiff's performance evaluation states explicitly that Plaintiff "continues to show a lack of professionalism towards the Director and team members," "does not adhere to department rules, regulations or guidelines," "has been counseled twice this year by the Director for speeding," and shows a "lack of respect for department management." (Pl.'s Perform. Eval. at 1–2.)

13

In response, Plaintiff argues that her previous overall performance ratings of "Very Good" to "Outstanding" on her evaluations during the 2015/2016, 2016/2017, and 2017/2018 school years are evidence that she was meeting the School Board's expectations. (Pl.'s Mem. in Opp'n at 20–21.) Additionally, she argues that all three "supervisors" within the Transportation Department praised Plaintiff's performance. (*Id.*) However, of the three "supervisors" Plaintiff refers to, only Nase was Plaintiff's actual direct supervisor.[11] (SUMF ¶ 6.) Although C. Thweatt was "the first line for driver concerns" (ECF No. 18-22) and was Plaintiff's supervisor at one time, he was not Plaintiff's supervisor at any time throughout the 2019/2020 school year or at the time of the performance evaluation. Moreover, Plaintiff knew that Nase was her direct supervisor, and it is his perception of whether expectations have been met, not other employees, that matter.[12] The prior evaluations from years past are immaterial as to whether Plaintiff was meeting the School Board's expectations in 2019/2020, which was the first year she was supervised and evaluated by Nase.

Plaintiff also asserts that Nase's public statement at the bus driver meeting in November 2019 that "[Plaintiff] was a good, skilled driver, and did her job well," or

---

[11] The opinions of Plaintiff's co-workers are similarly irrelevant and insufficient to prove that Plaintiff was meeting the School Board's legitimate expectations. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998).

[12] Additionally, Grimes' "Areas of Concern Report" stating that C. Thweatt was "not evenly enforcing Transportation policy, regulations, and procedures" shows that Nase and C. Thweatt likely had much different expectations for the department. (Grimes' Report at 14, ECF No. 18-9.)

words to that effect, is evidence that she was meeting expectations. (*Id.*)  These employer statements can be considered "viable evidence an employer's expectations were met." *See Cannada v. Old Dominion Brush, Co., Inc.*, No. 3:20-cv-952-HEH, 2021 WL 5441506, at \*5 (E.D. Va. Nov. 19, 2021).  However, Nase's statement here was prior to several of the conduct instances the School Board complained of and was nearly four months prior to Plaintiff's performance evaluation in April 2020.  The material question is whether Plaintiff was meeting the School Board's expectations close in time to her termination or non-renewal, not in the past.  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516–517 (4th Cir. 2006); *Diamond v. Bea Maurer, Inc.*, 128 F. App'x 968, 973 (4th Cir. 2005).  Nase's public statement, which occurred months prior to her performance evaluation, standing alone is not enough evidence to show that Plaintiff was meeting the School Board's legitimate expectations at the time of her performance evaluation.

Alternatively, Plaintiff argues that Nase's and Dr. Pennycuff's expectations were illegitimate, and therefore, should be ignored.  (Pl.'s Mem. in Opp'n at 21.)  Expectations are "legitimate" unless the plaintiff can muster evidence that they are a "sham designed to hide the employer's discriminatory purpose." *Warch*, 435 F.3d at 518 (citing *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002)).  Essentially, the employer's expectations of the employee must be bona fide. *Smith v. Premier Prop. Mgmt.*, 793 F. App'x 176, 179 (4th Cir. 2019).

Plaintiff argues that after the 2019 Holiday Party, Nase's expectations shifted and became a "sham designed to hide [his] discriminatory intent." (Pl.'s Mem. in Opp'n at

15

21.) Nase allegedly purposefully avoided giving Plaintiff her Transportation Department jacket, despite knowing she was supposed to get one. (*Id.*)  He also told other Caucasian bus drivers that they "had better stay away from those people," or words to that effect, supposedly referring to Plaintiff and other African American drivers. (*Id.*)  Additionally, Plaintiff alleges that after Nase viewed the video of the January 10, 2020 "negative talk incident," Nase sent an email concerning Plaintiff stating, "[u]ltimately these are the drivers with about 3 more that I identified the first week I was here.  I have been trying to work hard to remove the negative vibe and to eliminate the 'black and white' divide that has been created in this department." (*Id.* at 22.)

There is no evidence in the record that Nase's or the School Board's expectations were a sham or not bona fide.  While Plaintiff argues that the incidents above gave rise to sham or illegitimate expectations, she fails to recognize that these incidents were also followed by incidents of her own insubordinate and unprofessional conduct.  Plaintiff asserts that the "negative talk incident" was a private conversation that was brought to Nase's attention by a colleague who had a long-standing grudge against Plaintiff. (Pl.'s Mem. in Opp'n at 22.)  A conversation held outside, while the buses were preparing to load, on school property, and while on the job can hardly be considered a private conversation.  The fact that a colleague, regardless of her relationship with Plaintiff, overheard the conversation in the school parking lot is further evidence it was not private.  Moreover, Plaintiff's clear use of profanity and unprofessional tone in reference to Nase and the Department could certainly be construed by management as unprofessional and

16

insubordinate conduct. Plaintiff's specific reference to Nase identifying her and others as contributing to the "negative vibe" within the department and his perceived "black and white" divide shows that Nase was aware of Plaintiff's insubordinate and unprofessional conduct early on in his tenure. That email statement in isolation does not show that Nase's expectations were illegitimate or a sham.

Plaintiff also points to Nase's requests of bus seating charts and the verbal coaching she received for the concerned citizen call as other examples of sham expectations. First, Plaintiff argues that bus seating charts are not required because that requirement cannot be found in any "policies, procedures, or manuals." (Pl.'s Mem. in Opp'n at 22.) The School Board produced evidence, including depositions and an employee handbook from the 2013/2014 school year, that these seating charts were required. (Def.'s Reply at 5.) However, even assuming *arguendo* that these reports were not formally required, ignoring repeated requests by her direct supervisor to produce a seating chart can be considered insubordinate conduct, regardless of whether she was required to turn them in under previous supervisors. Second, Plaintiff alleges that the School Board cannot provide any proof that a concerned caller called in to the Transportation Department regarding Plaintiff's running of a red light. (Pl.'s Mem. in Opp'n at 22.) While the Court acknowledges that there may be no direct proof of the call, Plaintiff simply received a verbal coaching regarding the incident. (SUMF ¶ 25.) It is within the purview of the School Board's authority to issue a verbal coaching regarding an incident they have been made aware of but cannot completely corroborate. Nothing

17

about how Nase or the School Board handled the concerned call incident shows that their expectations of Plaintiff were illegitimate. Furthermore, there is no proof this incident played a role in Plaintiff's performance evaluation.

In summary, Plaintiff points to no current evidence that she was meeting the School Board's expectations when her contract was not renewed. Instead, she advances multiple reasons as to why the School Board's expectations are illegitimate. Nevertheless, these arguments fail because they do not point to any evidence that the School Board's expectations were a sham or less than bona fide. *Warch*, 435 F.3d at 518; *Smith*, 793 F. App'x at 179. Thus, Plaintiff failed to establish the third element of her *prima facie* case for discrimination. *See Guessous*, 828 F.3d at 219.

Even if the Court found that Plaintiff established the third element of her *prima facie* case, she cannot establish the fourth element. Again, the fourth element of the *McDonnell Douglas* framework requires plaintiffs to show "that the circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Swaso*, 698 F. App'x at 747. Plaintiffs typically establish this element with evidence that "similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). If the plaintiff does rely upon comparators, the similarity "must be clearly established in order to be meaningful." *Swaso*, 698 F. App'x at 748 (quoting *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)). The comparators must be "similar in all relevant respects" including that they worked under the same supervisor, regulations, and

circumstances as the plaintiff. *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Additionally, the comparators "must have been treated more favorably than the [p]laintiff *with respect to the adverse action complained of*." *Wilson v. City of Chesapeake*, 290 F. Supp. 3d 444, 458 (E.D. Va. 2017), *aff'd*, 738 F. App'x 169 (4th Cir. 2018) (citing *Haywood*, 387 F. App'x at 359) (emphasis added).

Plaintiff contends that Dunlow, a Caucasian bus driver, is a proper comparator. (Pl.'s Mem. in Opp'n at 24–25.) Plaintiff alleges that Dunlow was treated more favorably because she was given an overall "satisfactory" rating on her performance evaluation and her contract was renewed despite being issued a verbal disciplinary action form for leaving two students at school and failing to respond to radio communication attempts. (*Id.*) Dunlow also participated in the January 10, 2020 "negative talk incident" and received a Letter of Reprimand for that participation. (*Id.*)

While there are some similarities between Plaintiff and Dunlow, there are some striking differences as well. Although both participated in the "negative talk incident," Dunlow met with Nase to apologize for her unprofessional and inappropriate behavior and followed up with a letter of apology. (Def.'s Reply at 14.) Comparatively, Plaintiff did not meet with Nase following the incident and continued her insubordinate behavior by failing to turn in her bus seating charts after repeated requests, for which she received a written warning.

If the "negative talk incident" was the only conduct of Plaintiff and Dunlow, the outcome may be different. However, "insubordination is a legitimate, non-discriminatory

19

reason for discharge because Title VII does not insulate workers from 'the consequences of insubordination.'" *Sadeghi v. Inova Health System*, 251 F. Supp. 3d 978, 993 (E.D. Va. 2017) (citing *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)). Therefore, Plaintiff's additional unprofessional and insubordinate actions do not make her and Dunlow similarly situated for purposes of inferring discrimination. Accordingly, Plaintiff cannot meet the fourth element of her *prima facie* discrimination case.

As a matter of thoroughness, the Court will assume *arguendo* that Plaintiff has made a *prima facie* showing of racial discrimination. Even so, Plaintiff cannot show that the alleged legitimate, non-discriminatory reason for Plaintiff's nonrenewal is pretext for racial discrimination. If a plaintiff can establish a *prima facie* case, the defendant must next produce "a legitimate, nondiscriminatory reason for the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004); *Warch*, 435 F.3d at 514 (noting that this is a burden of production, not persuasion).

Here, as detailed above, the School Board supplied several legitimate, non-discriminatory reasons for not renewing Plaintiff's contract. The School Board established, as well as included in Plaintiff's performance evaluation, that Plaintiff continually showed a lack of respect for the Transportation Department and Nase, actively spoke out against him and created dissension, was warned about her speeding, and did not follow her direct supervisor's requests. Courts have consistently found that similarly articulated reasons meet the employer's production burden. *See, e.g., Sadehi,*

20

251 F. Supp. 3d at 994; *aff'd*, 711 F. App'x 174 (4th Cir. 2018); *Pearlman v. Pritzker*, 564 F. App'x 716, 719 (4th Cir. 2014).

Once the employer meets their production burden, the last step of the *McDonnell Douglas* framework requires a plaintiff to show evidence "that the employer's stated reasons 'were not its true reasons but were a pretext for discrimination.'" *Hill*, 254 F.3d at 285 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Even assuming Plaintiff can prove her *prima facie* case, she does not point to any evidence in the record to prove pretext.

As to the School Board's assertion of Plaintiff's insubordinate conduct, Plaintiff generally relies on the same arguments mentioned previously. She argues that Defendant improperly relied on the February 7, 2020 voicemail because there is no evidence it was even considered prior to the performance evaluation. (Pl.'s Mem. in Opp'n at 26.) Further, she argues that the School Board's allegation that she stated, "Nase is not my boss. Mr. Thweatt is my boss" is simply not true, and the School Board's reliance on letters submitted by Caucasian bus drivers in support of Nase days after Plaintiff submitted her Report of Discrimination and Harassment is improper for the same reason. (*Id.*) Lastly, Plaintiff argues that the School Board's claim that she "was trying to intimidate [Ms. Gay] to get extra routes" is unfounded because there is no evidence she intended to "intimidate" Ms. Gay by asking to be assigned field trips. (*Id.* at 27.)

Plaintiff's mere disagreement with the facts supporting the School Board's decision to terminate her does not establish that the decision was pretext for racial

21

discrimination. *Diamond*, 128 F. App'x at 972.  Whether the voicemail was considered prior to the performance evaluation is irrelevant because it does not change the fact that the voicemail was made and was unprofessional in nature.  The voicemail can be viewed within the context of the rest of Plaintiff's insubordinate behavior around the time of the performance evaluation.  Plaintiff argues that the School Board cannot rely on her statement that Nase was not her boss or the substance of the support letters because they are not true, however, there is no evidence in the record that Nase or the School Board improperly relied on that information.  "[I]n proving, pretext a plaintiff cannot merely make 'conclusory' statements which are not 'adequately supported by the facts in the record' before the Court." *Lovett v. Peaks*, No. 3:08-cv-384, 2009 WL 145003, at * 5 (E.D. Va. Jan. 16, 2009) (quoting *Chappell v. Sch. Bd. of City of Virginia Beach*, 12 F. Supp. 2d. 509, 518 (E.D. Va. 1998)).

Although Plaintiff disagrees that she was insubordinate or disrespectful, she has not offered any evidence to suggest that the School Board's reasons for the negative performance evaluation and nonrenewal recommendation were "so flimsy as to be untrue or implausible." *Thweatt*, 2022 WL 1696034, at *8.  Plaintiff cannot prove pretext merely by calling the prudence of the employer's reasoning into question. *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019); *see Reeves*, 530 U.S. at 148. The record is clear, evidenced by the January 10, 2020 bus film, the February 7, 2020 voicemail, and Plaintiff's failure to timely comply with Nase's requests for a seating chart, that she had a history of insubordinate and disrespectful conduct.  This indicates

22

that Nase's and the School Board's nonrenewal decision was founded and not pretextual. Thus, the Court will grant Defendant's Motion for Summary Judgment as to Count I.

## B. Count II – Retaliation

In Count II, Plaintiff alleges that the School Board retaliated against her by terminating her after she filed a "Report of Discrimination and Harassment." (Compl. at ¶¶ 63–72.) Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employee] had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). The elements of a *prima facie* retaliation claim under Title VII are: (1) engagement in a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Holland*, 487 F.3d at 218. If Plaintiff can prove her *prima facie* case, the School Board "must articulate a 'legitimate nonretaliatory reason for its actions,' at which point the burden shifts back to [Plaintiff] to 'demonstrate that the proffered reason is a pretext for forbidden retaliation.'" *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 78 (4th Cir. 2016) (quoting *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001)). In the final analysis, a plaintiff's protected activity must be the but-for cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362–63 (2013).

The School Board concedes that Plaintiff's nonrenewal was an adverse employment action and, for purposes of this Motion, will not challenge that Plaintiff's

23

filing of the Report was protected activity. (Def.'s Br. in Supp. at 21.)  However, the

School Board argues that Plaintiff cannot show a causal link between the protected

activity and the adverse employment action, and that the School Board's articulated

reasons for terminating Plaintiff are not pretextual. (*Id.*)

Plaintiff filed her Report on February 3, 2020. (SUMF ¶ 17.)  Nase completed her

performance evaluation on April 2, 2020, which recommended not renewing Plaintiff's

contract. (*Id.* ¶ 28.)  On May 21, 2020, Dr. Estes informed Plaintiff that her contract was

not being renewed for the 2020/2021 school year, and Plaintiff officially stopped working

for the School Board in June 2020. (*Id.* ¶¶ 31–33.)  The temporal proximity between

Plaintiff's Report and Nase's recommendation that she not be renewed likely

demonstrates Plaintiff's *prima facie* case. *S.B. ex. rel. A.L.*, 819 F.3d at 79; *Jacobs v.

N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 579 (4th Cir. 2015).  However, without more,

temporal proximity cannot prove pretext at the summary judgment stage. *See S.B. ex rel.

A.L.*, 819 F.3d at 79.

In this case, Plaintiff claims Nase retaliated against her protected activity by

"pad[ding] Plaintiff's personnel file with superfluous disciplinary actions" following her

Report of Discrimination and Harassment based on the "unfounded" Letter of

Reprimand.[13] (Pl.'s Mem. in Opp'n at 28.)  First, Plaintiff asserts that Nase retaliated by

---

[13] The Letter of Reprimand dated January 28, 2020, provides: "Any additional reports or events indicating continued negative or unprofessional [sic] as a team member of the transportation department and the PGCPS team, will lead to non-renewal, and or up to immediate dismissal." (ECF No. 18-13).

initiating a write up regarding her failure to turn in a seating chart, even though Plaintiff did so when requested on February 5, 2020, and it is not required by written policy. (*Id.*) As mentioned previously, even assuming *arguendo* that Plaintiff was not required to turn in a seating chart by written policy, she was clearly asked on multiple occasions by her direct supervisor to turn in a seating chart. Failing to adhere to these repeated requests, two of which occurred prior to the Letter of Reprimand and the filing of her Report, is evidence of her unsatisfactory performance, not of retaliation for her protected activity. Moreover, Nase advised C. Thweatt not to proceed with the write up on February 5, but it was only when both seating charts were not turned in at that time, that the written warning followed. (ECF Nos. 22-17 at 2; 18-18; 18-19; 18-20; 18-21.)

Next, Plaintiff alleges Nase gave her an unwarranted verbal coaching for supposedly running a red light, which Plaintiff denied, and the School Board could not corroborate. (Pl.'s Mem. in Opp'n at 28–29.) However, Plaintiff provides no proof that the verbal coaching played any role in her performance evaluation or the decision to not renew her contract. Thus, this does not display any retaliatory animus.

Finally, Plaintiff argues that Nase's performance evaluation was "unduly harsh and unfair, and included numerous false or overstated justifications." (*Id.*) As mentioned before, these statements are conclusory and is merely Plaintiff's subjective disagreement with Nase's evaluation of Plaintiff's performance. The record is sufficient to show that the School Board's decision to not renew Plaintiff's contract based on her insubordinate and unprofessional behavior was founded and not in retaliation for her Report.

In summary, much of Plaintiff's evidence shows that Plaintiff and Nase did not get along. However, "a personal conflict alone does not constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019) (citing *Hawkins*, 203 F.3d at 281). Plaintiff has not demonstrated that her protected activity was the but-for cause of her contract non-renewal. Looking at the evidence in the light most favorable to Plaintiff, she can only establish a temporal proximity between her protected activity and her termination. "Timing alone generally cannot defeat summary judgment." *S.B. ex rel. A.L.*, 819 F.3d at 79. Thus, the Court will grant Defendant's Motion for Summary Judgment as to Count II.

## IV. CONCLUSION

Based on the foregoing, the Court will grant the School Board's Motion for Summary Judgment (ECF No. 17) as to all counts and dismiss the Complaint (ECF No. 1) with prejudice.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Feb. 27, 2023
Richmond, Virginia